## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO
## SENIOR JUDGE MARCIA S. KRIEGER

Civil Action No. 18-cv-02213-MSK-GPG

STACIE CULP, and
STEPHANIE PETERS,

      Plaintiffs,

v.

REMINGTON OF MONTROSE, LLC, and
REMINGTON OF MONTROSE GOLF CLUB, LLC,

      Defendants.

---

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
## MOTION FOR SUMMARY JUDGMENT

---

**THIS MATTER** comes before the Court pursuant to the Defendants' (collectively

referred to as "Remington") Motion for Summary Judgment **(# 62)**, the Plaintiffs' response

**(#66)**, and Remington's reply **(# 69)**.

## FACTS

The Court briefly summarizes the pertinent facts here, taken in the light most favorable to

the Plaintiffs, and elaborates as necessary in the analysis.

Remington operates a restaurant and event space.  Plaintiff Stephanie Peters began a job

as a Server at Remington in June 2016.  In February 2017, Remington hired Jason DeSalvo as a

Bartender and Assistant Floor Manager.  Ms. Peters contends that Mr. DeSalvo was authorized

to act as her direct supervisor, although that fact is disputed.

Mr. DeSalvo made sexually-implicit and explicit comments to Ms. Peters and another co-

worker, such as inviting them over to his house to drink wine because his wife was away, asking

1

Ms. Peters if she "want[ed] a cock in [her] mouth," and referring to a calculator as a "cockulator."

Ms. Peters was told by the co-worker that the co-worker had complained about Mr. DeSalvo to Rick Crippen, Remington's Food and Beverage Manager, and Eric Feely, Remington's General Manager, but that neither acted in response. Eventually, the co-worker resigned and Ms. Peters concluded that complaints about sexual harassment to Remington's management would not be treated seriously.[1]

Ms. Culp was hired as a server at Remington in June 2017. Ms. Peters was assigned to train Ms. Culp. When Ms. Culp interacted with Mr. DeSalvo, he made a variety of sexually-implicit comments to her. For example, Ms. Culp alleges that Mr. DeSalvo offered to give Ms. Culp shots of alcohol if she got him the phone numbers of female customers and employees and asking Ms. Culp if she would participate in a threesome with him and a female guest. Mr. DeSalvo also touched Ms. Culp inappropriately on several occasions, deliberately touching her breasts while purporting to take glasses from a tray she was holding, touching the back of her neck and sliding his hand down her back, and standing close behind her in order to press his groin against her, among other instances. Ms. Culp reported these incidents to Ms. Peters and asked if she should report them to Mr. Crippen or other members of management. Mindful that

---

[1] The Plaintiffs allege that Mr. Crippen himself engaged in certain acts of harassment towards her and others, including implying that a bar tool was Ms. Peters' sex toy and agreeing with an employee who proposed locking Ms. Culp in the men's bathroom and not letting her out. The record does not reflect that Ms. Peters or anyone else ever lodged a complaint to Remington specifically about Mr. Crippen's conduct. In any event, the Court would find that the descriptions of Mr. Crippen's actions, while certainly unprofessional and inappropriate, were not sufficiently severe and pervasive to constitute actionable hostile environment harassment. Whether Mr. Crippen's own conduct is admissible for other purposes, such as showing Remington's management's lax attitude towards sexual harassment complaints, is a matter to be determined at the time of trial.

Remington management had apparently ignored her prior co-worker's complaints of sexual harassment, Ms. Peters cautioned Ms. Culp against raising the issue with upper management, and neither woman shared their complaints with any Remington official.[2]

By late June 2017, Ms. Culp applied for a position with a former employer, telling that employer of her problems at Remington.  Word of Ms. Culp's comments about Remington got back to Mr. Crippen, and on July 25, 2017, Mr. Crippen met with Ms. Culp to ask about the issue she was having with Mr. DeSalvo.  Eventually, Ms. Culp gave Remington a written statement that recited certain instances of inappropriate conduct by Mr. DeSalvo.

Mr. Feely and Beth Feely, Remington's Human Resources Manager, began an investigation into Ms. Culp's complaints.  As discussed in more detail below, that investigation was fairly limited, but even so, it adduced some evidence of Mr. DeSalvo having engaged in inappropriate behavior.  On August 5, 2017, Mr. and Ms. Feely decided to suspend Mr. DeSalvo for five days and to demote him from his supervisory position.

Ms. Culp alleges that, shortly after Mr. DeSalvo returned from his suspension, Mr. Crippen removed her from the work schedule entirely.[3]  On September 1, 2017, Ms. Culp resigned from Remington, stating that  it was "due to the sexual harassment and retaliation I have experienced."

---

[2]      Ms. Culp occasionally complained to Sherri James, an Event Manager that Ms. Culp understood to be a member of Remington's management staff.  Ms. James' actual management role is disputed by Remington, but it is undisputed that Ms. James never acted upon or passed Ms. Culp's complaints onto anyone else.

[3]      Remington contends that it reduced Ms. Culp's schedule beginning on or about August 19, 2017, when Ms. Culp returned to school and was only available to work at Remington on weekends.

Meanwhile, Ms. Peters was assigned to work with Mr. DeSalvo on August 17 and 18, 2017 after he returned from his suspension.  She states that during those shifts, he "treated me poorly and yelled at me for asking him about work-related matters."  Ms. Peters felt like she was being retaliated against for having supported Ms. Culp's complaints, and mid-shift on August 18, 2017, Ms. Peters resigned her employment with Remington.

Both women commenced this action, alleging: (i) claims of hostile environment sexual harassment under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* and the Colorado Anti-Discrimination Act ("CADA"), C.R.S. § 24-34-401 *et seq.*[4]; (ii) retaliation for engaging in protected conduct in violation of Title VII and CADA; and (iii) a tort claim for negligent supervision under Colorado law, invoking *Keller v. Koca*, 111 P.3d 445 (Colo. 2005).

Remington moves **(# 62)** for summary judgment on all claims against it.  As to the hostile environment claims, Remington contends that: (i) neither Plaintiff gave Remington actual or constructive notice of their concerns about Mr. DeSalvo prior to July 25, 2017; (ii) Mr. DeSalvo was not a supervisor of Ms. Culp or Ms. Peters, such that Remington would be vicariously liable for his harassment under *Burlington Industries v. Ellerth*, 524 U.S. 742, 760 (1998); and (iii) Remington can satisfy the affirmative defense to liability for supervisor harassment articulated in *Ellerth* because it promptly took adequate remedial actions upon learning of Ms. Culp and Ms. Peters' complaints of harassment.  As to the retaliation claims, Remington argues that neither Plaintiff can identify a retaliatory action taken by Remington after their complaints and that Remington had legitimate non-retaliatory reasons for reducing Ms. Culp's schedule.  Finally, as

---

[4]     Claims under CADA are analyzed using the same standards as Title VII claims.  *See Lawley v. Dep't of Higher Educ.*, 36 P.3d 1239, 1253–54 (Colo.2001).  Thus, the Court will not analyze the CADA claims separately.

to the negligent supervision claim, Remington argues that the Plaintiffs cannot show that Remington knew Mr. DeSalvo posed a risk of sexually harassing them.

## ANALYSIS

### A. Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th

Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine

dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material

fact, no trial is required.  The court then applies the law to the undisputed facts and enters

judgment.

      If the moving party does not have the burden of proof at trial, it must point to an absence

of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove.

If the respondent comes forward with sufficient competent evidence to establish a *prima facie*

claim or defense, a trial is required.  If the respondent fails to produce sufficient competent

evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of

law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### B.  Hostile environment claim

      For purposes of the Plaintiffs' hostile environment claim, Remington effectively

concedes (at least for purposes of this motion) that Mr. DeSalvo engaged in conduct amounting

to sexual harassment in violation of Title VII.  Thus, the issue is whether Remington can be held

liable for that harassment.

      The Supreme Court has set forth different standards for holding an employer liable for

workplace sexual harassment, depending on the status of the employee engaging in the offending

conduct.  When the employee is a non-supervisory co-worker, the employer's liability turns on

ordinary principles of negligence.  *Vance v. Ball State University,* 570 U.S. 421, 427 (2013).

The plaintiff employee bears the burden of showing that the employer had actual or constructive

knowledge of the harassment, and that it thereafter failed to take "remedial and preventative

action . . . reasonably calculated to end the harassment."  *Jackson v. Kansas City Public Schools*,

799 Fed.Appx. 586, 591 (10th Cir. 2020).

When the harassing employee is a supervisor, a standard is different. In *Ellerth*, the

Supreme Court discussed two forms of employer liability for a supervisor's sexual harassment.

First, when the harasser has taken a tangible employment action – *e.g.* a hiring, firing, failing to

promote, reassignment with significantly different responsibilities, or a decision causing a

significant change in benefits – against the employee in conjunction with the harassment, *Ellerth*

deems the employer to be strictly liable for the harassment based on principles of agency.  524

U.S. at 762, 764.  If the employee cannot show a tangible employment action taken as part of the

campaign of harassment, the employer can still be liable for the harassment, but the employer

can assert various affirmative defenses.  For example, that: (i) the employer exercised reasonable

care to prevent and promptly correct any sexually harassing behavior; and (ii) the plaintiff

employee unreasonably failed to take advantage of any preventative or corrective opportunities

provided by the employer to avoid harm.  *Id.* at 764-65. As to the affirmative defenses, the

employer bears the burden of proof by a preponderance of the evidence. *Id.*

In order to apply the correct analysis, the Court must first determine whether Mr.

DeSalvo was the Plaintiffs' supervisor.  There is evidence that, prior to his demotion, all of the

parties considered Mr. DeSalvo to have supervisory authority with regard to Ms. Culp and Ms.

Peters. As to Remington's knowledge, the disciplinary notice it issued to Mr. DeSalvo on August

4, 2017 identifies his job title as "Assistant Floor Manager" and states that he was being demoted

to his "original position as Server/Bartender," until Remington could "determine if a position in

a supervisory role is earned and warranted."  The record also indicates that higher-level

Remington officials, like Mr. Crippen, considered Mr. DeSalvo's recommendations about

employee's performance.  In addition, Ms. Culp testified that Mr. DeSalvo served as a "manager

on duty" in Mr. Crippen's absence and that in such capacity Mr. DeSalvo had the authority to

send servers home or to assign them to particular duties, and Ms. Peters testified that Mr.

Crippen specifically informed her that Mr. DeSalvo was "her manager." Taking the evidence in

the light most favorable to the Plaintiffs, there is a triable question as to whether the Remington

vested Mr. DeSalvo with supervisory authority.[5] *See Vance*, 570 U.S. at 446-47 (supervisory

status may exist where an employer relies upon recommendations from the alleged supervisor

concerning tangible employment decisions).

But supervisory authority alone does not render an employer automatically liable for

sexual harassment committed by that supervisor. As *Ellerth* explains, "a tangible employment

action taken by the supervisor becomes for Title VII purposes the act of the employer," as the

supervisor typically "must obtain the imprimatur of the enterprise" to cause the tangible action to

occur. 524 U.S. at 762-63. But *Ellerth* goes on to explain that when "supervisor harassment [ ]

does not culminate in a tangible employment action," the path to employer liability is "less

obvious." The Court noted that "on the one hand, a supervisor's power and authority invests his

or her harassing conduct with a particular threatening character," but "on the other hand, there

are acts of harassment a supervisor might commit which might be the same acts that a co-

employee would commit, and there may be some circumstances where the supervisor's status

makes little difference." 524 U.S. at 763. Thus, *Ellerth* made the supervisor's taking of a

tangible employment action the *sine qua non* for automatic vicarious employer liability; if the

supervisor's harassment did not include a tangible employment action, the employer retains the

---

[5]      Even if Mr. DeSalvo were not a supervisor, for the reasons discussed below, the Court
would nevertheless find that, at a minimum, Remington had actual knowledge of Mr. DeSalvo's
harassment by July 24, 2017. There is a genuine dispute of fact as to whether Remington's
subsequent investigation into and remediation of that harassment was reasonable, and thus, the
Court would deny summary judgment to Remington on the hostile environment claims
regardless of Mr. DeSalvo's supervisory status.

opportunity to establish its affirmative defense discussed above, even if the harasser had supervisory status.

Here, the Plaintiffs make no showing that Mr. DeSalvo himself took a tangible employment action against either one. They do not contend that Mr. DeSalvo fired them, initiated any disciplinary action against them, reassigned them to substantially different duties, or even sent them home prematurely when they objected to his conduct. Rather, the Plaintiffs make clear that it was Mr. Crippen who was responsible for scheduling Ms. Culp's shifts (or, conversely, not scheduling them).

An employee cannot show that a supervisor's harassment "culminates" in a tangible employment action merely by showing that the employment action followed the harassment. Rather, the employee must establish a "strong causal nexus between the supervisor's harassment and the employment action," implicating the harassing supervisor in the decision-making process for the alleged employment action. *Helm v. Kansas*, 656 F.3d 1277, 1287 (10th Cir. 2011). Because Ms. Culp cannot show that Mr. DeSalvo used his supervisory authority to take a tangible employment action against her as part of his campaign of harassment, she cannot hold Remington directly liable under *Ellerth*.[6] *Id.* ("Helm has offered no evidence that connects

---

[6]     The Plaintiffs response brief makes a passing mention of a theory that Ms. Culp and possibly Ms. Peters were constructively discharged by Remington. They do not meaningfully develop this argument and the Court finds that, as a matter of law, the circumstances that both Plaintiffs faced after Mr. DeSalvo's return from his suspension do not rise to the point of being "so difficult or intolerable that [they] ha[d] no other choice but to quit." *Sampson v. Kane Is Able, Inc.*, 812 Fed.Appx. 746, 749 (10th Cir. 2020). Ms. Culp worked without incident and without encountering Mr. DeSalvo until she was removed from the schedule. Ms. Peters worked two more shifts with Mr. DeSalvo where he "treated [her] poorly and yelled at [her] for asking him about work-related matters" before she decided to resign. The Court cannot conclude that Ms. Peters had no choice but to quit in that circumstance, particularly insofar as she did not attempt to report Mr. DeSalvo's new conduct to Remington for further disciplinary consideration.

Judge Stewart's harassment to Chief Judge King's termination decision") (emphasis in original); s*ee also Stapp v. Curry County*, 672 Fed.Appx. 841, 848 (10th Cir. 2016) (employee failed to show "any tie between" the alleged tangible action of a delayed pay raise "and any particular supervisor, let alone one with a[ harassing] motivation").

Because the Plaintiffs cannot show that Remington is automatically liable for Mr. DeSalvo's harassment under the *Ellerth* standard, the Court turns to the question of whether Remington has established that, as a matter of law, it satisfied its obligations under the *Ellerth*. To prevail on its affirmative defenses Remington must show that there is no genuine dispute as to whether: (i) it exercised reasonable care to prevent and promptly correct any unlawful harassment; or (ii) that the Plaintiffs unreasonably failed to take advantage of preventative or corrective opportunities Remington provided them.  524 U.S. at 764-65.

To establish the first element – reasonable efforts at prevention and correction – Remington may prove the prevention prong by demonstrating that it adopted valid anti-harassment policies and distributed those policies to employees via employee handbooks.  *Stapp*, 672 Fed.Appx. at 849.  As to this, Remington has produced an employee handbook that describes its anti-harassment policy.  It has also produced an acknowledgement form signed by Ms. Culp, attesting to her receipt of a copy of that handbook.  But Ms. Culp disputes that she was actually given a copy of the handbook at all.  She concedes that she signed an acknowledgement form that was given to her, but testified that "when I signed all of my employee paperwork, it was done very hastily.  I was pressured.  I was given a million things to sign and was not allowed time to have questions.  I was not given the handbook."  Ms. Peters also signed a form acknowledging something associated with an employee handbook: her acknowledgment form reads, simply "The Bridges Employee Handbook Acknowledgement," and a signature of Ms.

Peters.  The Plaintiffs do not point to testimony from Ms. Peters denying ever having received a copy of the handbook.

As for the correction prong, Remington must show that when it was given proper notice of allegations of sexual harassment, it acted reasonably promptly to investigate and address those complaints.  *Stapp*, 672 Fed.Appx. at 849.  It must also show that its corrective efforts were "reasonably calculated to end the harassment and deter future harassers."  *Kramer v. Wasatch County Sheriff's Office*, 743 F.3d 726, 747 (10th Cir. 2014).  Remington argues that it first learned of Ms. Culp's complaints about Mr. DeSalvo on or about July 24, 2017, when Joelle Recalde, another Remington server, reported to Mr. Crippen that a friend of hers who managed another restaurant had recently interviewed Ms. Culp for a server job and that Ms. Culp had mentioned Mr. DeSalvo's harassment of her as her reason for wanting to leave Remington.  Mr. Crippen called Ms. Culp immediately, "on speaker phone so Ms. Recalde could listen," and asked if Ms. Culp "had anything she wanted to tell me about her work at Remington."  Ms. Culp stated that everything was "fine."  Mr. Crippen pressed Ms. Culp twice more about whether she had any concerns at work, and Ms. Culp repeatedly denied any such concerns.  It does not appear that, in this initial call, Mr. Crippen disclosed to Ms. Culp what he knew about Ms. Culp's comments to third parties or specifically asked her about her comments to the other employer.

The following morning, Mr. Crippen, Mr. Feely, and possibly Ms. Feely met in person with Ms. Culp.  According to Ms. Culp, this meeting occurred during a shift while she was still attending to customers.  Ms. Culp states that she reported to them "that there were several events of sexual harassment and how uncomfortable I had felt."  Mr. Crippen states that the officials "asked Ms. Culp to provide a written statement detailing the alleged events, including the date, time, location, the names of individuals involved, and any witnesses."  According to Ms. Culp,

they stood and waited while she prepared the written document, and because "I had tables

waiting on me . . . I felt pressure to be quick and didn't have time to be as thorough."  Ms. Culp's

written statement reads:

> Jason [DeSalvo] has repeatedly placed his hand on the back of my
> neck in a way that I do not feel comfortable with.  Regardless of
> intention.  I do not feel comfortable with how he touches me and
> find it unprofessional.
>
> At a wedding approx. 1 month ago, Jason also asked me if I would
> be willing to have a 3-some with him and another girl that was a
> guest at the wedding.  This was entirely inappropriate and made
> me <u>very</u> uncomfortable.  He has also touched my butt in ways that
> I feel are not only inappropriate but intentional.

In his own affidavit, Mr. Crippen complains that this statement "did not provide details as we

had requested," but it does not appear that any official sought to re-interview Ms. Culp later to

ask for clarification or additional information.

Remington's investigation into Ms. Culp's complaints was jointly conducted by Mr. and

Ms. Feely, but Mr. Feely testified that he asked all the questions and Ms. Feely took notes on

each interviewee's answer.  Mr. Feely testified that he had no particular training in sexual

harassment or in investigating sexual harassment complaints, whether through Remington or any

of his prior employers.  Although Remington's lawyer encouraged Mr. Feely to interview every

employee in the restaurant and event division, Mr. Feely decided that this "was unnecessary,

given the fact that several of those employees were never around [Ms. Culp], didn't work in the

same area, didn't work the same shift."  He also chose not to interview any male employees

about what they might have witnessed.  Mr. Feely did not "believe there was anything . . . about

[Mr. DeSalvo] or anybody having a problem with somebody from the male standpoint. . . . [W]e

were investigating someone who would have a sexual impropriety towards him as a female, not

as a male."

Ms. Feely testified that the interviews with the selected servers consisted of "two questions only,": (i) "is there anything around Jason DeSalvo that you would like to disclose or talk about?," and (ii) "is there anything you would like to add?"  Ms. Feely testified that they deliberately did not ask the interviewees about any interactions that they might have witnessed between Ms. Culp and Mr. DeSalvo because they were attempting to keep Ms. Culp's complaint "confidential" at her request.[7]  Ms. Feely testified that even though an interviewee might mention "something relating to harassment or inappropriate conduct, no follow-up question was asked" because "we just let them, you know, share whatever they needed to share."

The Feely's refusal to ask any follow-up questions left many relevant issues unexplored, as several of the servers that they interviewed disclosed matters that certainly warranted further investigation.  In one interview, a server reported that Mr. DeSalvo "speaks about other servers' asses."  Another server reported that Mr. DeSalvo "has said a few inappropriate things"[8] and that she "heard of him touching others, but not me."  A third server reported that on one occasion, "I was joking [with Mr. DeSalvo] one night" when it seemed like "a switch went off [and he] called me the B word."  A fourth server described Mr. DeSalvo as being "flirtatious."  It is undisputed that Mr. Feely did not ask any follow-up questions to obtain additional information about any of these matters.  Mr. Feely also spoke to Ms. Peters.  Ms. Peters states that she told Mr. Feely that she had personally witnessed Mr. DeSalvo being "sexually inappropriate to me, Ms. Culp, and

---

[7]      Ms. Culp notes that, despite these ostensible efforts, she was quickly mocked by other servers who were interviewed.

[8]      One of the inappropriate comments the server specifically described related an incident in which Mr. DeSalvo made a comment to another female employee about "having a threesome."

other women." She "made them aware of his sexual comments, sexual conduct towards me and [Ms. Culp], and some of the underage girls that were working at Remington."[9]

Eventually, the Feelys shared the notes from their interviews with Remington's lawyer. The lawyer advised Mr. Feely to ask the servers for additional information specifically about Mr. DeSalvo "speak[ing] about other servers' asses," about his "flirtatious" behavior, about the "inappropriate things" one server reported hearing, about reports of him touching other servers, as well as on several other specific topics. However, Mr. Feely chose not to conduct any further follow-up interviews. He initially declined to do so because "we were still doing other interviews" with other servers. And eventually, the Feelys "started thinking differently" about Ms. Culp's allegations. They decided that "based on what we got from the other [employees], . . . . we felt like a lot of the accusations were false and we were starting to believe there was maybe a reason to question the whole thing," meaning Ms. Culp's complaint. He went on to state "at that point we were questioning the honesty of Stacie Culp."[10] Mr. Feely became persuaded that Ms. Culp's version of events was, perhaps not fabricated, but was "spun in a way that isn't what was actually said." He explained that:

---

[9]     One of the servers interviewed by the Feelys also mentioned Mr. DeSalvo sometimes commenting to underage servers about unspecified things he wanted to do "when you turn 18. . . ."

[10]    It is not clear from the record whether the Feelys or Mr. Crippen ever obtained more detailed allegations from Ms. Culp than the written statement she provided.   The record does not suggest that they interviewed Ms. Culp again after July 25, and thus, it appears that her written statement is the complete package of allegations Remington was investigating.

 If that is the case, Mr. Feely's decision that Ms. Culp had somehow been dishonest is a curious one. Ms. Culp related three allegations in her initial written statement: (i) that Mr. DeSalvo repeatedly touched her on her neck and back in a way that made her uncomfortable, (ii) that Mr. DeSalvo propositioned her to participate in a threesome, and (iii) that Mr. DeSalvo touched her butt. Mr. Feely's investigation had revealed evidence that Mr. DeSalvo had engaged in two of those behaviors – propositioning a co-worker for a threesome and touching a co-worker's butt – with other servers as well.

> I think the girls had a few behavioral things with [Mr. DeSalvo].
> A lot of the girls liked [Mr. DeSalvo]; a lot of them thought he did
> a good job.  There was, you know, keeping in context where
> somebody got mad during a busy night or somebody made her say
> the F word or call her a bitch.  Yeah, I think a lot of those
> comments are what they are.  And I felt like a lot of the comments
> from [Ms. Culp] were false.

The Court finds that there is at least a triable question of fact as to whether Remington's investigation into Ms. Culp's allegations of sexual harassment by Mr. DeSalvo was reasonable. Mr. Feely arbitrarily chose to interview only a subset of co-workers who might have relevant information about Mr. DeSalvo's conduct, and purposefully asked generalized and open-ended questions.  When persons that Mr. Feely did interview made comments that clearly indicated potential inappropriate workplace behavior by Mr. DeSalvo, Mr. Feely declined to ask for clarification or follow up on those leads, even after Remington's counsel specifically encouraged him to do so.  Mr. Feely did not ask the co-workers about specific interactions they observed between Mr. DeSalvo and Ms. Culp.

In addition, at some point during the investigation, Mr. Feely decided that the goal should change from investigating the Mr. DeSalvo to investigating Ms. Culp's honesty, despite having at least two of the instances recited in her written complaint corroborated by other servers.  There was considerable evidence from several sources that Mr. DeSalvo engaged in inappropriate and sexually-tinged workplace conduct, but Mr. Feely casually brushed that evidence off as "behavioral things" that could be overlooked because most servers liked Mr. DeSalvo and thought he did a good job. Finally, there is evidence that Remington's lawyer recommended Mr. DeSalvo be terminated, and that Mr. Feely rejected that suggestion and instead imposed only a short suspension.

In this regard, the facts are similar to those in *Kramer.*  There, a Sheriff's deputy filed a complaint accusing a Sergeant of sexually harassing, assaulting, and ultimately raping her.  The Sheriff's Office did not consult with professionals about how to conduct the investigation and assigned a Detective to investigate the complaint despite the fact that the Detective had never been trained as to how to investigate harassment complaints and was friendly with the alleged harasser.  The Detective did not follow appropriate investigatory procedures, such as obtaining statements from possible witnesses on both sides of the issue.  Eventually, the Detective shifted the focus of the investigation from the deputy's harassment complaint to investigating whether the deputy was having a consensual affair with a firefighter.  When the deputy sued the Sheriff's Department for sexual harassment, the Department argued that its investigation satisfied its obligations under the *Ellerth* affirmative defense.  The 10th Circuit reversed the trial court's grant of summary judgment to the Department, finding that the various irregularities and defects in the investigation prevented a finding that "there remains a genuine issue of fact as to whether the [Department's] response . . . fell short of demonstrating that [the Department] took reasonable efforts to discharge its duty under Title VII, as required to establish the affirmative defense." 743 F.3d at 747-50.

Under these circumstances, this Court finds that Remington has not carried its burden of showing that, as a matter of law, its investigation of Ms. Culp's complaint was reasonably calculated to ensure Remington's compliance with Title VII.  There is, at the very least, a triable issue of fact as to whether Mr. Feely's investigation was competent, thorough, and objective. The fact that Ms. Culp never worked alongside Mr. DeSalvo after the investigation does not alter the results.  As *Kramer* explains, "the fact that the harassment end[ed after the investigation] is not sufficient by itself" to avoid liability under Title VII.  743 F.3d at 750.  Thus, the Court

denies Remington's motion for summary judgment on the Plaintiffs' hostile environment claims.[11]

### C.  Retaliation

To establish a claim for retaliation, the Plaintiffs must first make a *prima facie* showing that: (i) they engaged in protected activity; (ii) they suffered an adverse employment action; and (iii) the adverse action occurred in circumstances suggesting a causal relationship to the protected activity.  If the Plaintiffs carry that burden, Remington must articulate a legitimate, non-retaliatory reason for the adverse action, and the Plaintiffs bear the burden of demonstrating that the proffered reason is a pretext.  *See Mann v. XOP Logistics Freight, Inc.*, 819 Fed.Appx. 585, 606 (10th Cir. 2020); *Laul v. Los Alamos Natl. Labs.*, 765 Fed.Appx. 434, 441 (10th Cir. 2019).  It is undisputed that both Ms. Culp and Ms. Peters engaged in protected conduct relating to Ms. Culp's complaint of harassment by Mr. DeSalvo and Ms. Peters' expressing support for Ms. Culp's allegations during the investigation.

Turning to Ms. Culp's claim first, there is a genuine issue for trial as to whether Ms. Culp experienced an adverse employment action after making her claim.  It is undisputed that, shortly after Mr. DeSalvo completed his suspension, Ms. Culp notified Mr. Crippen that she would be returning to school during the weeks, but that she would continue to be available to work weekends.  Not long thereafter, Mr. Crippen removed Ms. Culp entirely from the schedule of future shifts.  According to Mr. Crippen, he did so because he believed that she had taken another job elsewhere and was no longer available to even work weekends, although he did not

---

[11]    It is not clear to the Court whether Ms. Peters is asserting a hostile environment claim of her own, and, if she is, the basis for that claim.  Neither Remington's motion nor the Plaintiffs' response attempts to untangle the particular claims asserted by each Plaintiff and the factual basis underlying them.

identify the source of that belief.[12]  Although the period between Mr. Crippen removing Ms. Culp from the schedule and Ms. Culp tendering her resignation was brief, Mr. Crippen's testimony indicates that he purposefully ceased scheduling her for shifts, not that   Accordingly, the Court finds that Ms. Culp has come forward with evidence that she suffered an adverse employment action.

Playing out the rest of Ms. Culp's retaliation claim, Mr. Crippen's removal of her from the schedule occurred about a month after she lodged her formal complaint against Mr. DeSalvo. The 10th Circuit has held that an adverse action that close temporal proximity between protected conduct and adverse action can, of itself, suffice to demonstrate the causal connection required by the *prima facie* case.  Thus, Ms. Culp can establish a *prima facie* case of retaliation. Remington has proffered several mutually-inconsistent explanations as to why it stopped scheduling Ms. Culp: because she moved a long distance away to attend school, because fewer hours were available, and because she took another job.  But the record makes clear that Ms. Culp advise Remington that she would still be available and willing to work weekends (and that Mr. Crippen understood that).  Thus, Ms. Culp's retaliation claim presents a genuine issue for trial.

As to Ms. Peters, the question is more difficult.  The only adverse action she claims to have experienced after cooperating in the investigation was being forced to work with Mr. DeSalvo on two shifts.  It is undisputed that there was an incident between Ms. Peters and Mr. DeSalvo on one of those shifts.  According to Ms. Peters, Mr. DeSalvo delayed filling her drink

---

[12]    Remington's briefing appears to argue that Ms. Culp was removed from the schedule due to "the limited available hours" as its business wound down from its peak season.  But Mr. Crippen's testimony makes clear that the real reason for his decision was his belief that Ms. Culp had taken another job.

orders and refused to provide her with a bottle of wine that a customer had ordered.  Ms. Peters

states that Mr. DeSalvo was "laughing and just like not taking me seriously," that he told her "I

don't have time for this shit," and that she "shoved [her], kind of."  Immediately after that

incident, Ms. Peters resigned to Remington.

       For retaliation claims, it is not necessary that the adverse action tangibly affect the terms

and conditions of employment.  All that is necessary is that the action be sufficient that it would

deter a reasonable employee from engaging in protected conduct. *Burlington Northern & Santa*

*Fe Ry. Co v. White*, 548 U.S. 53, 67-68 (2006).  In *Gunnell v. Utah Valley State College*, 152

F.3d 1253, 1264 (10th Cir. 1998), the 10th Circuit acknowledged that "co-worker hostility or

retaliatory harassment, if sufficiently severe, may constitute 'adverse employment action' for

purposes of a retaliation claim."  *Gunnell* further requires that, for continuing co-worker

harassment to constitute retaliation, "supervisory or management personnel either [ ]

orchestrate[d] the harassment or [ ] kn[e]w about the harassment and acquiesce[d] in it in such a

manner as to condone and encourage the co-workers' actions."  *Id.* at 1265.

       As noted above, there is a genuine issue of fact as to whether Mr. DeSalvo was truly a

supervisor of Ms. Peters.  But even assuming he was, there is no evidence that he leveraged his

supervisory power over Ms. Peters during the workplace dispute after the investigation.  Rather,

it appears that the dispute was equivalent to an argument between co-workers.  Under *Gunnell*,

then, Ms. Peters must show that Remington's upper management either orchestrated Mr.

DeSalvo's harassment of her or, at the very least, knew of and acquiesced in Mr. DeSalvo's

conduct.  She has not done so.  It is undisputed that Ms. Peters first reported of Mr. DeSalvo's

post-investigation harassment[13] at the same time that she resigned.  Because she did not give Remington the opportunity to address the issue, Ms. Peters cannot show that Mr. DeSalvo's post-investigation harassment constituted an adverse action for retaliation purposes.  Thus, Remington is entitled to summary judgment on Ms. Peters' retaliation claim.

### D.  Negligent supervision

In *Keller*, the Colorado Supreme Court considered an employer's liability to a 12-year old girl who was sexually assaulted on the employer's premises after business hours by an off-duty employee acting outside the scope of his employment.  The Court found that negligence principles might permit the employer to be held liable for sexual misconduct committed by the employee towards "young women working at the dry cleaners and potential customers," due to the employer's knowledge that the employee had engaged in harassing and improper behavior during work hours, but that the employer would not be expected to foresee that the employee would proceed assault a non-employee/non-customer after hours on company property without permission.  111 P.3d at 448-449.  The Plaintiffs argue that, under *Keller*, Remington is liable in negligence for failing to act against Mr. DeSalvo after learning of his harassing conduct.

Assuming, without necessarily holding, that tort claims for negligent supervision based on workplace harassment can lie alongside Title VII and CADA claims based on the same conduct, *see e.g. Alarid v. MacLean Power, LLC*, 132 F.Supp.3d 1299, 1305-06 (D. Colo 2015), it is clear that the Plaintiffs must show that Remington "kn[e]w or should have known that [Mr.

---

[13]     It may be tempting to bootstrap Mr. DeSalvo's pre-investigation acts of harassment to his post-investigation conduct for purposes of determining whether Remington can be held liable for the retaliatory character of the latter.  After all, Remington was cognizant of Mr. DeSalvo's prior harassing conduct and, apparently, failed to discipline him strongly enough to deter further acts of harassment.  But the Court's focus is on the question of whether Mr. DeSalvo harassed Ms. Peters <u>because of</u> her actions during the investigation.  Thus, the proper focus is on Mr. DeSalvo's <u>post</u>-investigation harassment and Remington's knowledge thereof.

Desalvo] would cause harm" before liability could attach.  111 P.3d at 448.  It is clear that Remington learned of Ms. Culp's allegations against Mr. DeSalvo on July 24, 2017, but it is equally clear that neither Plaintiff was actionably harassed by Mr. DeSalvo after that date.  Thus, the Plaintiffs devote considerable argument to arguing that Remington was actually or constructively aware Mr. DeSalvo's conduct earlier, mostly by operation of Ms. Culp complaining to Ms. Peters of that conduct during Ms. Peters' training of Ms. Culp.  It is undisputed that Ms. Culp did indeed complain of Mr. DeSalvo to Ms. Peters, but it is equally undisputed that Ms. Peters never informed Remington management of Ms. Culp's complaints.  Thus, the crux of the Plaintiffs' knowledge argument is that Ms. Peters was functionally a supervisor for Remington, such that notice to Ms. Peters was sufficient to give notice to Remington generally.

The Court rejects the suggestion that Ms. Peters had any supervisory authority within Remington.  Ms. Culp conceded that Ms. Peters did not have the power to discipline her, to set her schedule, or to send her home.[14]  Ms. Culp just assumed that because Ms. Peters "was to show me my job . . . I was supposed to do what she did," that Ms. Peters was therefore a part of her  "chain of command."  Ms. Culp did not ask anybody, including Ms. Peters, whether that was a correct assumption, nor does she point to any statement by any Remington official that encouraged her to consider Ms. Peters her supervisor.  Nor does the record suggest that Ms. Peters considered herself to have any authority over Ms. Culp or represented herself to Ms. Culp as such.  In these circumstances, the Court finds that Ms. Peters did not serve as a supervisor or agent of Remington for purposes of receiving reports of sexual harassment.

---

[14]     Indeed, in Ms. Culp's affidavit tendered to the Colorado Civil Rights Division, she describes Ms. Peters as "my co-worker," rather than "my supervisor."

Ms. Culp also argues that she reported Mr. DeSalvo's harassment to an Event Coordinator named Sherry James.  Ms. Culp argues that Mr. Crippen introduced Ms. James as a "manager" when he first introduced Ms. Culp to Ms. James.  According to Ms. Culp, she complained of various acts of harassment by Mr. DeSalvo to Ms. James on two occasions in June 2017.  Remington disputes that Ms. James had any supervisory or management authority, but Ms. Culp's testimony that Mr. Crippen represented her as such creates an issue of fact as to whether Ms. James was a designated agent of Remington to receive complaints of harassment. Thus, at least for purposes of the negligent supervision claim, the Court will assume that Ms. Culp's complaints to Ms. James in June 2017 gave Remington notice of Mr. DeSalvo's conduct. Under a negligent supervision theory, Remington was then obligated to exercise reasonable care to protect Ms. Culp against subsequent harassment.  Thus, Ms. Plaintiffs' negligent supervision claim can proceed to trial.

## CONCLUSION

For the foregoing reasons, Remington's Motion for Summary Judgment (**# 62**) is **GRANTED IN PART**, insofar as Remington is entitled to summary judgment on Ms. Peters' retaliation claim, and **DENIED IN PART**, insofar as the remaining claims will proceed to trial. The parties shall begin preparation of a Proposed Pretrial Order and shall jointly contact chambers to schedule a Pretrial Conference.

Dated this 19th day of August, 2021.

**BY THE COURT:**

Marcia S. Krieger
Senior United States District Judge